**CLARK PACIFIC, a California general partnership, Plaintiff,**

v.

**KRUMP CONSTRUCTION, INC., a Nevada corporation; and Eric Raecke, individually and in his official capacity as Manager, Nevada Public Works Board, Defendants.**

No. CV–N–96–0576–ECR.

United States District Court, D. Nevada.

Oct. 15, 1996.

William A.S. Magrath, II, Timothy E. Rose, and James C. Giudici of McDonald, Carano, Wilson, McCune, Bergin, Frankovich & Hicks, Reno, NV, for plaintiff.

Jonathan L. Andrews, Attorney General's Office, Carson City, NV, for defendant Raecke.

Michael B. Springer, Reno, NV, for defendant Krump Construction.

### ORDER

EDWARD C. REED, Jr., District Judge.

### Introduction

This is a dispute between Clark Pacific, a construction subcontractor on a public works project, Krump Construction, the general contractor, and Mr. Eric Raecke, Manager of the Nevada Public Works Board, which is responsible for awarding public works contracts in this State. Presently before the court for decision is Plaintiff Clark Pacific's Motion for Preliminary Injunction (Doc. # 4). The court previously, by Order dated September 19, 1996 (Doc. # 10), issued a temporary restraining order against Defendants Krump Construction and Nevada Public Works Board Manager Eric Raecke, pending a hearing on the motion for preliminary injunction. The parties presented extensive evidence and argument at a hearing which commenced October 1, 1996 and concluded October 10, 1996. Having heard that evidence, and the parties' arguments, the court is now prepared to issue its ruling on the motion for preliminary injunction.

Plaintiff Clark Pacific alleges both federal question and diversity jurisdiction. 28 U.S.C. §§ 1331, 1332. Clark Pacific claims that Defendants' substitution of another construction subcontractor in its place violates its right under the Fourteenth Amendment to the United States Constitution not to be deprived of property without due process of law. Clark Pacific also claims a violation of its right under a Nevada statute not to be replaced as a public works construction subcontractor absent the existence of specific circumstances set out in that statute, and, as a citizen of California, invokes the court's diversity jurisdiction over its suit against Krump, a Nevada corporation, and Eric Raecke, a Nevada public employee.

### I. Facts

From the evidence adduced to date, the court makes the following findings of fact:

In May and June of 1996 the Nevada Public Works Board solicited bids for construction work to be performed at one of Nevada's prisons, the Lovelock Correctional Center. The State planned additions to the Correctional Center consisting of new prisoner housing facilities and some modifications to the prison industries building. Only two companies bid for the prime contract; one was Clark & Sullivan, the other was Defendant Krump Construction. Under the terms of the solicitation documents, bids were to be submitted sealed, to be opened at two o'clock on the afternoon of June 18, 1996 ("bid day").

Clark Pacific, a California-based pre-cast concrete subcontractor, prepared a written

bid to perform the design, manufacture, erection, alignment, welding and grouting of architectural precast concrete sandwich wall panels, interior walls, chases, floor and ceiling slabs, beams and columns for the three new prisoner housing units at Lovelock Correction Center. Early on the morning of June 18, Clark Pacific transmitted its bid form by electronic facsimile to Krump Construction and to Clark & Sullivan, omitting Clark Pacific's base price. Such is standard practice in the construction industry: Bidders on public works subcontracts withhold their base price almost until the last minute, in order to give the general contractor no pre-bid-time opportunity to "shop" the subcontractors' numbers to other subcontractors in the hope of obtaining a lower price.

Clark Pacific's bid form was transmitted to Krump at 7:23 a.m. on bid day, June 18, 1996. The Clark Pacific bid contained a number of qualifications and conditions including, of particular importance,

(1) the duration of the work to be performed by Clark Pacific. Clark Pacific's bid contemplated a period of 125 days between the issuance by Krump of its "notice to proceed" and the commencement by Clark Pacific of precast concrete panel erection, and a period of 100 days for Clark Pacific to achieve "substantial completion" of its portion of the project;

(2) a requirement that the General Contractor provide 440–volt electrical power to the construction site for the welding together of the precast concrete panels;

(3) a requirement that the General Contractor provide and maintain all-weather access roads to the construction site;

(4) a requirement that the General Contractor provide "deadmen," which are large concrete blocks designed to support temporarily the precast concrete panels until they can be welded into position.

During the morning of June 18, 1996, Mark Robison, Clark Pacific's Project Manager, phoned Rusty Heberger, Krump's Project Manager, to confirm that Krump had received and reviewed Clark Pacific's bid. Mr.

Heberger told Mr. Robison that he had received the bid but had not yet reviewed it. Later the same morning Mr. Heberger telephoned Mr. Robison

(1) to determine the size of the deadmen required by Clark Pacific,

(2) to ascertain the number of coil rods required,

(3) to inquire whether Clark Pacific would stop work if progress payments were late,

(4) to discuss the liquidated damages provision of Clark Pacific's bid,

(5) confer regarding Clark Pacific's requirement that Krump provide electrical power for the welding, and

(6) to establish the maximum allowable markup to which Clark Pacific would be entitled on any orders changing the specifications on any portion of Clark Pacific's scope of work.

Mr. Robison advised Mr. Heberger that about 10,000 coil rods were needed, that he needed time to calculate the size of the deadmen, and that the maximum markup on change orders would be fifteen per cent.

At 11:34 a.m. Mr. Robison telephoned Mr. Heberger and informed him that he did not yet have the dimensions of the required deadmen, and further advised him that the provision by Clark Pacific of electrical welding power would add $20,000 to Clark Pacific's base price.

At 1:14 p.m. Mr. Robison again telephoned Mr. Heberger and advised him that Clark Pacific would reduce the number of deadmen required from 500 to 300, and that Clark Pacific required three cubic yard deadmen for exterior walls and one cubic yard deadmen for interior walls. Mr. Robison then indicated to Mr. Heberger that Clark Pacific was adding a ninth "special condition" to its bid form. Special Condition No. 9 required the General Contractor to provide temporary heat at a minimum of fifty degrees Fahrenheit to allow proper curing of the grout used to join the precast concrete panels. This condition was designed to address the problem of pouring concrete in cold weather: Winters in Lovelock, Nevada, are bitter cold,

too cold for concrete or grout to cure properly. The wet grout must be kept warm after it is applied to the joints between the precast panels, either by applying hot blankets to the surface of the material, or by heating the surrounding air. Mr. Robison read Special Condition No. 9 to Mr. Heberger and asked him to note it on the bid form, which Mr. Heberger did, in his own handwriting, on the bid form which had been transmitted by Clark Pacific to Krump earlier that morning.

During this conversation Mr. Heberger asked Mr. Robison if the 100 days for completion of concrete panel erection were 100 calendar days or 100 working days. Mr. Robison responded that the 100 days were calendar days, but that the 100 days did not include total completion of alignment, welding and grouting; and that "total" completion of erection would occur within approximately 30 days after substantial completion. Mr. Heberger objected and indicated that Krump would require total completion 100 days of the erection start date. Mr. Robison said he could promise Clark Pacific would try to minimize completion time, but he did not agree to revise Clark Pacific's bid to incorporate a guarantee of total completion within 100 days of the erection start date.[1]

At 1:47 p.m. on June 18, 1996, only minutes before the time set by the State for opening of the sealed bids, Mr. Robison telephoned Mr. Heberger with Clark Pacific's base price in the amount of $4,625,000.00.

At 2:00 p.m. June 18, 1996, the bids were opened. Krump was determined to be the low bidder. Krump had listed Clark Pacific as its pre-cast concrete subcontractor, in accordance with the requirement of both the owner's solicitation documents and Nevada statutory law that general contractors bidding on public works construction projects list in its prime bid the name of each subcontractor to be paid at least five percent of the general contractor's total bid.

Two days later, at 4:00 o'clock p.m. on June 20, 1996, Mr. Heberger, by electronic facsimile, transmitted a handwritten letter to Mr. Robison setting forth what he described as the "basics of the contract," and indicating that a copy of the proposed subcontract with Krump would be sent to Clark Pacific the following day. Mr. Heberger's June 20 letter contained 16 adjustments to the terms of the proposed precast concrete subcontract. Five of these items later became the bones of contention between Clark Pacific and Krump; Clark Pacific objected to these adjustments on the grounds that they were inconsistent with the terms of its bid. These five items were:

(1) a $10,000.00 reduction in Clark Pacific's bid price;

(2) the transfer of the responsibility to provide deadmen, which under Clark Pacific's bid was an obligation of the general contractor, from Krump to Clark Pacific;

(3) a reduction of the period between issuance of the notice to proceed and commencement of precast concrete panel erection, from the 125 days provided in Clark Pacific's bid to 111 days;[2]

(4) the deletion of Krump's obligation, as set forth in Clark Pacific's bid, to provide all weather access roads to the site; and

(5) the elimination of Krump's responsibility, as set forth in Clark Pacific's bid, to provide 440-volt electrical power for Clark Pacific's welding.[3]

---

1. Mr. Robison testified that it is Clark Pacific's practice to employ four separate work crews on precast concrete panel erection projects: One crew moves the precast concrete slabs into position with a crane, a second crew corrects the alignment of the panels, a third crew then welds the panels together by means of steel components embedded in edges of the concrete panels, and a fourth crew applies a grouting mixture to the seams between the panels. In this manner the alignment, welding and grouting crews follow the erection crew, so that by the time erection is substantially complete, the alignment, welding and grouting will be only a few panels behind.

2. Mr. Heberger's letter of June 20, 1996 did not challenge the 100-day period for substantial completion of erection of the panels contained in Clark Pacific's bid.

3. Nor did Mr. Heberger's letter attempt to dispense with or modify Clark Pacific's Condition # 9, concerning temporary heat, which Mr. Robison had communicated to Krump by telephone

On June 21, 1996, Mr. Robison sent Krump Clark Pacific's response to Mr. Heberger's letter of June 20, 1996. In his letter Mr. Robison

(1) called attention to the fact that Mr. Heberger's letter had reduced the bid price by $10,000;

(2) reminded Krump that Clark Pacific's bid was based on Krump's providing 500 deadmen; Clark Pacific promised to work with Krump in reducing the number of deadmen required to the extent Clark Pacific would not thereby incur any additional costs;

(3) indicated that under the terms of Clark Pacific's bid Krump was to construct and/or maintain all-weather access roads, and further indicated that Clark Pacific had not included in its base price the cost of providing such roads;

(4) informed Krump that Clark Pacific's bid required the provision of 440–volt electrical power for its welders, and that if Clark Pacific were to provide the 440 volt power it would cost Krump an additional $20,000; and

(5) agreed that Clark Pacific would attempt to shorten the time to commence construction, and requested help from Krump in this regard, but indicated that it was at this early stage impossible to determine how much, if any, improvement in the erection start date schedule was feasible.

Clark Pacific attached a copy of its original bid form to this June 21, 1996 letter. The copy of the bid form did not contain Special Condition No. 9 regarding temporary heat. But Mr. Robison testified that that special condition had been telephoned in to Krump prior to bid time and was noted by hand by Rusty Heberger on Clark Pacific's bid form. The fact that Special Condition No. 9 does appear on Krump's bid day copy of Clark Pacific's bid, in the handwriting of Krump's Project Engineer, Rusty Heberger, constitutes strong evidence that Special Condition No. 9 was in fact communicated by Clark Pacific to Krump prior to the opening of the bids, and the court so finds.

immediately prior to the opening of the bids in

On June 24, 1996, Clark Pacific received the proposed precast concrete subcontract from Krump. This subcontract contained each of the modifications to the Clark Pacific bid which appeared in Mr. Heberger's letter of June 20 to Clark Pacific. On June 24, 1996, Mark Robison telephoned Mr. Heberger (1) to discuss the proposed subcontract; (2) to determine if Krump had received Clark Pacific's response dated June 21, 1996; and (3) to confirm a meeting of the parties scheduled for June 26, 1996.

Mr. Heberger told Mr. Robison that if Krump had to pay for the disputed items, that Clark Pacific would no longer be the low bidder, and that Krump was already negotiating with another pre-cast concrete subcontractor. This statement suggests that Krump had already obtained a lower precast concrete subcontract price, including the cost of the disputed items, from Buehner Corporation, one of Clark Pacific's competitors, else Krump could not have claimed with confidence that Clark Pacific would, in the event Clark Pacific did not agree to perform the additional work without additional compensation, no longer be the low bidder on the precast concrete subcontract.

Later the same day, June 24, 1996, Mr. Robison and Mr. Thomas Tucker, Clark Pacific's Managing Engineer for Liability and Contracts, placed a telephone call to Defendant Eric Raecke, Manager of the Nevada Public Works Board, to express their concern that Krump might be engaged in illegal bid shopping. Mr. Raecke assured Mr. Robison and Mr. Tucker that Clark Pacific was protected against wrongful substitution under the Nevada subcontractor listing law. Mr. Raecke informed Robison and Tucker that Krump had not at that time made any request for substitution of Clark Pacific by another subcontractor, and he promised to let them know if Krump did so.

On June 26, 1996, a meeting was held at the Reno offices of Krump Construction. Attending on behalf of Clark Pacific were Mr. Donald Clark, co-owner and General Operations Manager of Clark Pacific, and Mr. Mark Robison, Clark Pacific's Project Man-

the afternoon of June 18, 1996.

ager for the Lovelock project. Representing Krump Construction were Mr. Rusty Heberger, its Senior Project Manager, and Mr. Ron Deal, Krump's Project Superintendent. By the conclusion of the June 26, 1996 meeting all the outstanding issues between Krump and Clark Pacific appeared, at least to Clark Pacific's representatives, to have been settled, with the exceptions of the issues regarding welding power, Errors and Omissions coverage, and the project schedule.

Before the June 26, 1996 broke up, Mr. Bruce Gordon of Krump presented to the Clark Pacific representatives a schedule of work for the project which appeared to be in accordance with Clark Pacific's bid. Mr. Gordon asked the Clark Pacific people to review this schedule and then to contact Krump Construction. Krump offered testimony that it offered Clark Pacific this schedule not as a proposed schedule, but rather with the request that Clark Pacific "see what it could do" to *improve* on the dates it contained. But Bruce Gordon himself testified that he could not recall precisely how the June 26 schedule was submitted to Clark Pacific, or whether anyone had made such contemporaneous representations regarding the purpose of giving Clark Pacific this schedule, or whether Clark Pacific was aware that the schedule was being offered for review, rather than for approval. Mr. Gordon did testify that Mr. Heberger had asked that the word "preliminary" be written on the front of the schedule, but the copy admitted in evidence contains no such notation. The court finds that the schedule presented to Clark Pacific at the June 26 meeting was presented as a proposed schedule on behalf of Krump.

On July 3, 1996, Mr. Heberger and Mr. Deal telephoned Mr. Tucker and Mr. Robison. During this telephone call Mr. Heberger announced (1) that Krump would not construct or maintain any all-weather access roads; (2) that Krump's project schedule given to Clark Pacific at the June 26 meeting was unacceptable, and that Krump had now prepared a new schedule; (3) that Krump would only pay $10,000 for welding power. In addition, Krump apparently reneged on the agreements reached on June 26 regarding the construction and maintenance of all-weather access roads, and on the provision of temporary heat for the curing of grout. Finally, Krump apparently also refused to accept Clark Pacific's approval of the project schedule it had been provided at the June 26, 1996, meeting; Krump now objected to the erection start date and completion duration set out in the June 26 schedule.

Hearing this news, Clark Pacific requested a copy of the "new" Krump schedule, and Mr. Heberger said he would "get it right out." Curiously, Clark Pacific did not receive a copy of this revised work schedule until July 9, 1996. Clark Pacific's erection start date in the new Krump schedule was 17 days earlier than Clark Pacific's bid and 17 days earlier than the date contained in the June 26 schedule. In other words, Clark Pacific would have to have completed manufacture of the precast concrete panels, and have delivered them to the jobsite almost three weeks earlier than was contemplated under the terms of its bid.

In the meantime, Clark Pacific engineers continued to prepare shop drawings and perform engineering calculations, as was Clark Pacific's usual practice during such negotiations. Because the Lovelock Project was the third time Clark Pacific had been employed as precast concrete subcontractor on projects where Krump had been the general contractor, it seems reasonable to infer that Krump would have known that Clark Pacific was performing this preparatory work, at considerable expense. Such an inference permits the further inference that by exploiting, if not intentionally creating this delay, Krump was strengthening its own hand in the negotiations; the more work Clark Pacific performed prior to executing a subcontract, the greater incentive it would have to cave in to Krump's demands for various—and costly—concessions.

On July 10, 1996, Clark Pacific responded with a proposed work schedule of its own, which maintained 125 days to start work and 100 days from commencement of erection to substantial completion; but provided for "total" completion from commencement of erection within 103 days, approximately 27 days

sooner than the 130 days for total completion which Mr. Robison told Mr. Heberger Clark would perform prior to the bid opening.

Later that same day, July 10, 1996, Don Clark of Clark Pacific had another telephone conversation with Ron Deal and Rusty Heberger of Krump. In that conversation Mr. Clark offered:

(1) to attempt to use 220 volts of electricity for Clark Pacific's welders; but still insisted on the $20,000 if Clark Pacific was to provide its own electricity; and

(2) to provide Krump with a price for the provision of temporary heat for curing the grout; however, he

(3) refused to guarantee total completion of erection, alignment, welding and grouting within 100 days, as requested per Krump's July 3, 1996, schedule (which had not been received by Clark Pacific until July 9, 1996).

The next day, July 11, 1996, Don Clark advised Krump that he had been unable to calculate an accurate price for providing temporary heat and would, therefore, stand upon Special Condition No. 9 in Clark Pacific's bid, requiring Krump to provide the temporary heat. After July 10 Krump made no further communication or contact with Clark Pacific concerning the disputed issues or the subcontract.

On July 12, 1996, Ron Krump, president of Krump Construction, returned from his vacation[4] and found that the negotiations between Krump and Clark Pacific had reached an impasse. It is clear that by this date Krump had been for some time conducting negotiations · with Buehner Corporation, at least since before June 24, 1996, and likely commencing immediately after bid day, in order to reach an agreement on precast concrete manufacture on terms more favorable to Krump than those contained in Clark Pacific's bid. Although Mr. Ron Krump denied under oath that Krump Construction had initiated any post-award negotiations with Buehner Corporation, Buehner's own letter to Krump dated July 1, 1996, addressed to Mr. Ron Deal, begins, "Thank you very much for your interest in Buehner Corporation. . . ." This evidence convinces the court that it was Krump, not Buehner, who first opened the lines of communication. What is more, the electronic facsimile heading on this document indicates transmission at 9:34 a.m., July 1, 1996. Buehner's letter is accompanied by six separate attachments, including a proposed preliminary schedule for the Lovelock project, a letter dated July 1, 1996 from Union Pointe General Contractors recommending Buehner's work on a previous Utah project, and a schedule of commercial airline flights between Salt Lake City and Reno, which Buehner obtained for the purpose of encouraging any three Krump representatives to fly to Salt Lake, all expenses paid, for a tour of Buehner's facilities. It seems to the court extraordinarily implausible that Buehner could have received Krump's expression of "interest" in Buehner that Monday morning, July 1. The very latest Krump could have contacted Buehner, in time to enable Buehner to compose its detailed response, was the previous Friday, June 28, 1996. It seems to the court not even remotely possible that on June 28, 1996—a total of four days after submitting its proposed subcontract to Clark Pacific[5]—Krump could

---

4. The court observes parenthetically that despite the contentions of Mr. Raecke and other witnesses that the Lovelock project was of such urgency that the State would brook no delays in its completion, it was revealed during the course of the hearing on Plaintiff's motion for preliminary injunction that the Public Works Board voluntarily delayed for five days the issuance of a notice to Krump Construction to proceed with the project, on account of Mr. Ron Krump's scheduled vacation. Such willingness to adjust the project schedule to accommodate Mr. Krump's holiday undermines the State's position that the public interest is ill-served by delay which might result from the court's granting of a preliminary injunction in this matter.

5. In fact, Mr. Ron Krump testified that on June 26, 1996, the day he left for his holiday, Krump Construction and the State of Nevada had not yet executed a prime contract, so that Krump could not legally have executed a subcontract with Clark Pacific prior to that date. This fact narrows the period between the date Clark Pacific could first have executed a subcontract and the date Krump Construction began shopping Clark Pacific's bid to Buehner Corporation to *two days*. Even leaving aside the problematic language in the Nevada subcontractor listing statute, it seems to the court quite impossible that two days could constitute the requisite "reasonable opportunity" after which a listed subcontractor who has failed to execute a written subcontract with the general

have made a convincing argument that Clark Pacific had already become so intractable and adamantine in its subcontract negotiations that Krump should at that early stage have been entitled, under the terms of Nevada's law regarding substitution of listed public works subcontractors, to dump Clark Pacific as its precast concrete subcontractor. Indeed, Mr. Ron Krump himself testified that a "reasonable time" for general and sub to execute a subcontract might be three weeks after bid day. Less than one week after bid day, and less than one day after submitting a proposed subcontract, Krump Construction had already informed Clark Pacific that it had entered into negotiations with a substitute precast contractor.

Mr. Krump testified that by July 12 he fully intended to replace Clark Pacific, and it is obvious he intended to replace Clark Pacific with Buehner. Mr. Krump acknowledged he knew Buehner was in dire financial straits, indeed, on the very verge of bankruptcy. Buehner appeared a soft target; Krump could shop Clark Pacific's bid to Buehner, who would almost certainly shave their profits to near zero simply to maintain cash flow, and thus avoid bankruptcy while undercutting Clark Pacific's bid.[6] On July 12, a meeting was held between Mr. Heberger, Mr. Deal and Mr. Roger Arnell, representing Buehner Corporation. Mr. Krump had instructed Mr. Heberger and Mr. Deal to determine whether Buehner could meet Krump's requirements with respect to the schedule, temporary heat, grouting, and welding power, and to inquire into the status of Buehner's Nevada subcontractor's license.

On Monday, July 15, 1996 Ron Krump directed Mr. Heberger to make a formal request for substitution. Mr. Heberger prepared a letter dated July 15, 1996, to the Project Architect, Charlie Grundy, requesting substitution of Buehner for Clark Pacific as pre-cast contractor. Perhaps coincidentally, or perhaps through some clairvoyance, Don Clark told Tom Tucker on July 15, 1996 that he was concerned about the progress of Clark Pacific's negotiations with Krump Construction; Clark told Tucker he thought "something was going on." Tucker tried telephoning Ron Deal on July 15 and 16, but was unable to reach Mr. Deal, and his messages went unanswered. Tucker then decided to contact Eric Raecke at the Public Works Board, after seeing Mr. Raecke's name on the solicitation documents, and the two spoke late in the day on Tuesday, July 16, 1996.

Mr. Tucker asked Mr. Raecke whether Krump had submitted any request to substitute Clark Pacific off the Lovelock Project, and Mr. Raecke denied knowing of any such request. Mr. Raecke and Mr. Tucker discussed the Nevada subcontractor listing law, and Mr. Raecke expressed his understanding that law provided only a few narrow grounds upon which a general public works contractor

contractor may be substituted out by the general contractor.

**6.** Buehner's June 18, 1996 bid to perform the precast concrete portion of the Lovelock project was $5.03m; the precast concrete subcontract offered to Buehner by Krump on July 15, 1996 carried a price tag of only $4.415m. Somehow Buehner shaved $615,000.00 off its original bid. Don Clark testified that Clark Pacific built a $750,000 profit margin into its $4.625m bid, a profit of 16.2%. Assuming Buehner's original bid included a similar margin, Buehner's 12.2% price reduction would have sheared off more than 75% of its margin. And Buehner, with creditors breathing down its neck, certainly had greater incentive to sacrifice profits than did Clark Pacific; likely Buehner's original margin was considerably lower than Clark Pacific's 16%. Human nature being what it is, allowing Buehner to perform the work at this price, with hardly any profit margin, entails precisely the type of risk of corner-cutting and shoddy workmanship on public buildings which is the key evil resulting from "bid-shopping." This risk appears especially grave in light of the facts that (1) Buehner's owners, and its counsel, have agreed personally to indemnify Krump Construction, (2) Krump retains a UCC security interest in all materials purchased by Buehner for the Lovelock project, (3) that Krump will withhold $500,000.00 of the total due Buehner under the purchase order to secure Buehner's performance and warranties, and (4) that the purchase order relieves Krump of any obligation to pay Buehner the balance until final completion of Buehner's work, including delivery, erection, aligning, welding and grouting. In performing its work under these terms, Buehner, which prior to this agreement was flirting with insolvency, may well see its finances stretched to the breaking point, providing an even more urgent incentive to try to conserve costs wherever possible, and whatever the risk to the quality of the finished project.

could substitute a listed subcontractor. Mr. Raecke indicated he "felt strongly" about adhering to the law's requirements, and volunteered to mediate between Clark Pacific and Krump. Mr. Raecke knew there was as yet no agreement between Clark Pacific and Krump Construction, he knew which terms still remained in dispute, and knew there had been a breakdown in communication. Nevertheless, according to his testimony, Mr. Raecke believed on July 16, 1996, that the parties were close to reaching an agreement.

On July 17, Mr. Heberger called Don Clark to request Clark Pacific's price for accelerating completion of the project from the 380 days provided in the bid solicitation documents to 330 days.[7] Mr. Clark replied that he would look into the matter; on July 17 Clark Pacific sent Krump its accelerated price: $150,000.00. On July 18, Don Clark called Mr. Heberger to see if he had received the acceleration price. Mr. Heberger told Mr. Clark that Krump had first to work out the accelerated project schedule with the State before it would be able to execute a subcontract with Clark Pacific. By this time Clark Pacific had several engineers working full time on shop drawings and engineering calculations. During his July 17 and 18 conversations with Clark Pacific, Mr. Heberger failed to mention Krump's pending request to substitute Clark Pacific off the Lovelock project.

On the same day, July 18, 1996, Mr. Grundy, the Project Architect, transmitted to the Public Works Board Krump's letter of July 15, 1996 requesting permission to substitute Buehner Corporation for Clark Pacific. It was at this moment that Public Works Board Manager Raecke first saw Krump's request for substitution. In the interim, Krump had apparently realized, or was told, that a request for substitution of a listed subcontractor must be made to the Public Works Board, rather than to the Project Architect, and so on that same day, July 18, 1996, Mr. Heberger prepared and sent a new letter to the Public Works Board, requesting the substitution of Buehner for Clark Pacific as precast concrete subcontractor. In his July 18 letter to the Public Works Board Mr. Heberger indicated that Clark Pacific's acceleration price was $150,000, whereas Buehner would do it for nothing. Mr. Heberger cited as Krump's reasons for requesting substitution (1) Clark Pacific's refusal to obtain "Errors and Omissions" insurance for their design work,[8] (2) Clark Pacific's demand that Krump supply temporary heat for grouting, which Mr. Heberger misrepresented to Mr. Raecke had not been a term of Clark Pacific's June 18 bid, (3) Clark Pacific's refusal to pay for Krump's extended field overhead resulting from any delay caused by Clark Pacific, and (4) an "increase" in Clark Pacific's erection schedule from 100 to 128 days.

Mr. Raecke spoke with Mr. Heberger by telephone on July 18, told Mr. Heberger he had now received Krump's request for substitution. Mr. Heberger indicated to Mr. Raecke that the parties were still "very far

---

7. Earlier that same day, July 17, 1996, Tom Tucker at Clark Pacific received a telephone call from Nevada Public Works Board Manager Raecke. Tucker asked Don Clark to join the conversation, which he did. Mr. Raecke informed them that the Project Architect had made a serious error in composing the bid solicitation documents: The specifications erroneously indicated a total project time of 380 days, instead of the correct time, 330 days. Raecke told Tucker and Clark that it was crucial the project be completed by July 1, 1997, so that Raecke could live up to the promises he had made to the legislature and to the Nevada Department of Prisons that the new prisoner housing units would be "on-line" by that date. The three men spoke for perhaps thirty minutes, and at the conclusion of the conversation Clark and Tucker promised to contact Raecke with a price for accelerating the date for the completion of Clark Pacific's work. Fortunately for Mr. Raecke, the total budget for the Lovelock project was some $2m over Krump Construction's total prime bid of $28,169,000; even if the State were obliged to pay the contractors for the cost of accelerating the project by 50 days, the project would still come in under budget.

8. Throughout these proceedings Krump Construction has maintained, despite the fact that on its two prior projects on which it used Clark Pacific as precast concrete subcontractor Krump waived its Errors and Omissions coverage requirement, that such a requirement is standard in all its subcontracts governing work with a design component. Mr. Ron Krump could not, however, name a single other subcontractor on the Lovelock project from whom Krump had demanded E & O coverage, with the exception of the fire protection systems subcontractor.

apart" on the terms of the precast concrete subcontract, especially with respect to the project schedule. Mr. Raecke told Mr. Heberger that he would make his decision on the matter the following week, apparently still hoping the parties could reach an agreement.

On Friday, July 19, 1996, and again on Monday, July 22, 1996, Don Clark or representatives of Clark Pacific tried repeatedly to telephone Mr. Heberger, but failed to reach him, and their messages went unanswered.

On July 22, 1996, Krump sent by electronic facsimile another letter to Mr. Raecke, asking for a decision on the request for substitution, and stating that it was "absolutely critical" that Krump be permitted to substitute Buehner for Clark Pacific "right away." On this day Mr. Raecke was preparing to leave town; he testified that at this point he "really wanted to get this issue behind us." On July 22, 1996, Mr. Raecke attached a "Post-It" adhesive note to Krump's July 22 letter, directing his assistant, Dan Daily, to approve Krump's request for substitution, which Mr. Daily apparently did, because on July 23, 1996, Krump sent Mr. Raecke written confirmation of its receipt of the Public Works Board's written approval of Krump's substitution request. Mr. Raecke did not prior to instructing Mr. Daily to approve the substitution request conduct any inquiry into the reasons for the parties' inability to contract; it was apparently his judgment that the failure of the parties to reach an agreement within thirty days of the award of the prime contract by itself constituted grounds to approve the substitution. Mr. Raecke did ask Mr. Heberger whether the subcontract offered to Clark Pacific contained the same general terms as those offered to other subcontractors, and was satisfied when Mr. Heberger said, "Yes."

On July 23, 1996, Clark Pacific was notified by Mr. Ron Deal of Krump Construction that Krump had substituted Clark Pacific out of the Lovelock project.

Later the same day, July 23, 1996, Don Clark did reach Mr. Raecke by telephone.

In response to Mr. Clark's questions, Mr. Raecke said that he had received a request from Krump to substitute Clark Pacific out of the Lovelock project, and that Krump had begun, with Mr. Raecke's authorization, to negotiate the terms of a precast concrete subcontract with another company. Mr. Raecke testified on direct examination that he kept from Mr. Clark the fact that he had, in fact, already instructed his assistant to approve the request. Mr. Raecke's explanation for being less than candid was his "faint hope" that perhaps the parties could still reach agreement, in which case he would have canceled his instructions to Mr. Daily to send Krump written authorization to substitute Buehner for Krump.

On July 24, 1996 the Public Works Board Project Manager Dan Daily sent Rusty Heberger official written approval of Krump's request to substitute Buehner for Clark Pacific. Mr. Daily sent courtesy copies to the Project Architect, to Eric Raecke, and to Chief Deputy Attorney General Jonathan Andrews, but not to Clark Pacific.

On July 26, 1996, Don Clark drove to Carson City and arrived unannounced at Mr. Raecke's office at the Public Works Board. Mr. Raecke was out of the office. Mr. Clark found Dan Daily, who showed him Krump's July 15 and July 18 letters requesting approval of the substitution, as well as the Public Works Board's written approval dated July 24, 1996, and gave Mr. Clark copies of these documents. Mr. Raecke arrived in the Public Works Board offices at approximately 5:00 p.m.; Mr. Clark remonstrated with Mr. Raecke over the substitution, and Mr. Clark departed after extracting from Mr. Raecke promises (1) not to take a final decision [9] on the matter until Clark Pacific had a full opportunity to present its side of the dispute, (2) to communicate Clark Pacific's position to Mr. Ron Krump and (3) to maintain contact Mr. Clark over the next few days. Mr. Raecke told Don Clark, "You guys are big boys and I'm not your father; you guys will have to settle this thing yourselves."

---

9. This promise seems peculiar in light of the fact that two days earlier Dan Daily had, with the express authorization of Mr. Raecke, transmitted final written approval of the substitution to Krump Construction.

Buehner Corporation was, in fact, ineligible to replace Clark Pacific as precast concrete subcontractor; on July 23, 1996 Buehner was not a licensed subcontractor. Nev. Rev.Stat. § 338.145 (prohibiting award of public works contract to unlicensed contractor). Mr. Raecke admitted that he failed to verify Buehner's license status prior to granting Krump's substitution request; subsequent to being informed by Clark Pacific's attorney, by letter dated July 25, 1996, that Buehner had no Nevada contractor's license, Mr. Raecke was forced to rescind his approval of the substitution by letter from Dan Daily to Krump Construction dated July 30, 1996. On that day, after learning of the State's rescission of the substitution request, Mr. Don Clark telephoned Mr. Ron Krump to confirm the rescission of Buehner's substitution, and to reaffirm to Krump that Clark Pacific remained ready, willing and able to perform its portion of the Lovelock project. Mr. Krump was unavailable, so Mr. Clark left a message, to which Mr. Krump did not respond. The following day, July 31, 1996, Tom Tucker wrote to Ron Deal at Krump Construction, reiterating Clark Pacific's readiness to perform the work, and requesting an immediate meeting between the parties to resolve the outstanding subcontract issues. Mr. Tucker indicated Clark Pacific's willingness to commence precast concrete panel erection 111 days after receiving a notice to proceed—in essence capitulating to the terms of Mr. Heberger's June 20 letter seeking a two-week advance on the erection start date over the date set out in Clark Pacific's original bid.

Krump Construction renewed its quest to oust Clark Pacific from the Lovelock Project. By letter dated August 1, 1996 from Rusty Heberger to Eric Raecke, Krump recharacterized its July 18 substitution request as seeking to employ Buehner as "precast *supplier*," and to employ Bragg Crane as erector, plainly attempting to circumvent Buehner's lack of a Nevada contractor's license: Unlike a true contractor, a mere furnisher of materials need not be licensed to participate in public works construction projects. Nor,

for that matter, does a materials supplier enjoy the protection of the listing statute.

During the latter portion of the same week, probably either Thursday, August 1 or Friday, August 2, Tom Tucker spoke with Eric Raecke. Mr. Raecke informed Mr. Tucker that he was in the process of responding to Clark Pacific's concerns, as expressed in its own letters and several letters to Mr. Raecke from Clark Pacific's attorney. During this conversation Mr. Raecke denied having received Krump's renewed substitution request, but did indicate that he was inclined to approve such a request if it contemplated using Buehner only as a material supplier, with the actual erection left to Krump itself or to a licensed erection contractor.

Some time after 5:00 p.m. on August 5, 1996, Mr. Raecke telephoned Don Clark to inform him of a meeting between the parties, at which Mr. Raecke would be present, scheduled the next day, August 6, 1996, at the Public Works Board in Carson City to attempt to resolve the matter.

On the afternoon of August 6, 1996, the parties met at the Public Works Board at Carson City. Present at the meeting were Donald Clark and his attorney, Ron Krump, Rusty Heberger, attorneys for Krump Construction, Eric Raecke, and a Deputy Attorney General, representing the Public Works Board. Clark Pacific's representatives arrived intending to offer Krump substantial concessions in an effort to retain their employment on the Lovelock project. Mr. Raecke asked whether Clark Pacific had a reasonable opportunity to agree on terms, and attempted to provide the parties a chance to state their case. Clark Pacific's attempts to question Mr. Heberger regarding the misstatements of fact in Krump's letters requesting substitution were stymied, however, when Mr. Springer, Krump's attorney, refused to allow any "cross-examination" of his client's employees.

Krump Construction offered as its reason for requesting substitution Clark Pacific's refusal to agree to the terms of the July 3 schedule.[10] Clark Pacific then agreed to

**10.** Krump Construction has attempted to portray Clark Pacific as immovable on the issue of Clark

meet all the terms of the July 3 schedule, despite substantial additional cost to Clark Pacific. Ron Krump expressed his concern that there had been "too much water under the bridge" for Krump and Clark Pacific to come to terms. At the meeting Ron Krump gave Clark Pacific the distinct impression he was uninterested in further negotiations. Mr. Raecke announced that he would render a final decision by August 9, 1996, and encouraged the parties to negotiate. Mr. Raecke and his attorney then excused themselves, offering the Public Works Board conference room to the parties should they wish to continue negotiating. Mr. Raecke's impression on leaving the meeting was that Clark Pacific appeared prepared to make "rather large concessions" in their efforts to keep their subcontract alive. Ron Krump promised Don Clark he would let him know the next day whether Krump would still agree to use Clark Pacific on the project.

The next day, August 7, 1996, Mr. Krump did telephone Don Clark, and admitted that Krump had issued a notice to proceed to Buehner Corporation "weeks" earlier, and that therefore Clark Pacific was out. On August 13, 1996, Mr. Raecke notified Mr. Ron Deal of Krump Construction of the Public Works Board's approval of Krump Construction's request to substitute Buehner Corporation as material supplier and Bragg Crane as erection contractor. Mr. Raecke testified that he approved Krump Construction's request for substitution on the grounds (1) that the parties had been unable to reach agreement; and that a reasonable period of time had passed for negotiations, and (2) that Clark Pacific had a reasonable period of time to approve the subcontract which had been tendered by Krump. Mr. Raecke testified that he accepted the representation of Krump that the subcontract tendered to Clark Pacific contained essentially the same provisions as the Clark Pacific bid; and that

that subcontract was essentially the same as the form of subcontract tendered to the other subcontractors on the Lovelock project.

The letters from Clark Pacific's attorneys to Mr. Raecke had, however, previously called Mr. Raecke's attention to the fact that the subcontract tendered by Krump to Clark Pacific was *not* in accordance with the terms of Clark Pacific's bid; the court finds that the terms of the subcontract tendered by Krump to Clark Pacific deviated significantly and materially from the terms of Clark Pacific's bid.

On August 19, 1996, Krump Construction requested a fourteen-day extension from the Public Works Board; Krump claimed a delay caused by the Board's consideration of Krump's renewed substitution request, following the Board's rescission, after learning of Buehner's ineligibility for substitution, of its earlier approval.

On the same day, August 19, Krump Construction sent Bragg Crane a proposed subcontract agreement, with a base price of $1.05m. Under the Bragg Crane erection subcontract, Bragg Crane was to provide its own deadmen, its own power (either gas or electric) for its welders, and temporary heat for curing the grout. The Bragg subcontract noted that the only access to the jobsite would be "the natural ground as it currently exists," and further required total completion of erection, including alignment, welding and grouting within 114 days of the erection start date of October 21, 1996.

On August 27, 1996 Krump Construction sent Buehner Corporation a purchase order for precast concrete panels with a total price of $3.415m. The Buehner purchase order indicated that Krump had already issued Buehner a notice to proceed on July 22, 1996—in other words, on a date when Buehner's substitution had been authorized by the

---

Pacific's schedule. In fact, according to the court's calculations, Clark Pacific had several times prior to the August 6 meeting given ground on scheduling: Clark Pacific's bid day schedule required a total of 253 days (125 days from notice to proceed to start of erection, 100 days to substantial completion, and 28 days for completion of the alignment, welding and grouting). On July 10 Clark Pacific offered a 242–day

schedule (118 days to start of erection, plus 124 days to total completion of erection). On July 31 Clark Pacific further reduced its schedule demands to 235 days (111 days to erection start, 124 days to total completion). Before the final pre-litigation meeting of the parties, Clark Pacific had voluntarily cut 7% off its schedule for no additional compensation.

Public Works Board on the erroneous premise that Buehner was a licensed Nevada subcontractor. Under the terms of the purchase order, Buehner was to have completed all manufacture and delivery of precast concrete panels, and to begin panel erection 91 days after the July 22 notice to proceed.

## II. The Subcontractor Listing Statute

■ More than in many other businesses, public works construction contracting is a game of minutes.[11] The owner solicits bids from general contractors, to be submitted sealed, and then opened together on an appointed date and hour, with the prime contract going to the lowest bidder. In the interval between solicitation and "bid day," prospective general contractors solicit bids from competing subcontractors for the various portions of the particular project falling within the subcontractors' respective specialties, e.g. plumbing, steel erection, fire protection. Subcontractors withhold their bids until nearly the last possible moment, hoping to avoid giving the prime contractors time to "shop" the subs' bids around before bid time in search of a lower price. Prime contractors then have only hours, sometimes only minutes, to prepare their own prime bid based upon the last-minute bids of perhaps dozens of subcontractors. Because a prime contractor's bid binds it to the owner, the prime contractor must be able to rely upon the subbids; a sub who is listed by the general contractor in the prime bid is liable to the prime contractor should the sub later withdraw. *Drennan v. Star Paving Co.,* 51 Cal.2d 409, 333 P.2d 757 (1958) (Trainor, C.J.).

The rule of *Drennan* gives winning generals considerable bargaining power over listed subs: The prime contractor is legally entitled

to performance of all the subcontracts relied upon in making the prime bid, but the subcontractors are entitled to no protection against the prime contractor's continuing to shop around, even after the award of the prime contract, for cheaper subs. *Norcross v. R.W. Winters,* 209 Cal.App.2d 207, 25 Cal. Rptr. 821, 828 (1962); *see also Stano v. Soldo Constr. Co.,* 187 N.J.Super. 524, 455 A.2d 541 (App.Div.1983); Justin Sweet, *Legal Aspects of Architecture, Engineering, and the Construction Process* 631–32 (4th ed. 1989).

The drive to enact state statutes requiring listing of subcontractors on public works project, and limiting the grounds for post-award substitution of listed subcontractors, came about at least in part because of pressure from subcontractors' trade associations, *see, e.g., Coast Pump Assocs. v. Stephen Tyler Corp.,* 62 Cal.App.3d 421, 133 Cal.Rptr. 88, 91 (1976) (recognizing goal of subcontractor listing statute to be protection of original subcontractor against substitution), but also because of the indirect effects of ruthless bidshopping, which include poor workmanship provided by subcontractors who, desperate to retain their subcontracts, shave their profits and expenses below a level which guarantees quality work, subcontractors' insolvencies, and construction workers' lost wages. *See, e.g., R.M. Sherman Co. v. W.R. Thomason, Inc.,* 191 Cal.App.3d 559, 236 Cal.Rptr. 577, 582 (1987); *E.M. Watkins & Co. v. Board of Regents,* 414 So.2d 583, 587 (Ct.App.Fla. 1982); *Bay Cities Paving and Grading, Inc. v. Hensel Phelps Constr. Co.,* 56 Cal.App.3d 361, 128 Cal.Rptr. 632, 634 (1976); *Kuhn Constr. Co. v. Delaware,* 366 A.2d 1209, 1214 (Del.Ch.1976); *see also* Robert Duffy, *Stalling on Sub–Bid Law Will Cost,* Boston Bus. J., April 8, 1991, at 10.[12] In addition, subcon-

11. For a rather theatrical depiction of the final minutes of the bidding process on a public works project, see Tom Durkin, *Anatomy of a Construction Bid,* Bus.J., Feb. 25, 1991, at 19.

12. *See also* Thomas P. Lambert, Comment, *Bid Shopping and Peddling in the Subcontract Construction Industry,* 18 U.C.L.A. L.Rev. 389, 394–96 (1971) including among the detrimental effects of bid-shopping (1) the padding of subcontractors' bids to hedge against subsequent reductions during post-award negotiations between general and sub; (2) the forcing upon subcontractors of a "Hobson's choice" between losing

money on the job and doing substandard work; (3) the increased risk of the loss of time and money spent in bid preparation by contractors whose bids are used by others in bid-shopping and bid-peddling; (4) the increased risk of errors in prime bids occasioned by subcontractors' withholding bids until the last minute; (5) reduced competition among subcontractors, and hence increased costs to the public, caused by the refusal of some contractors to bid at all when faced with the risk of bid-shopping; (6) the "perversion" of free competition resulting from the fact that the savings from post-award bid-shop-

tractors who expect bid-shopping may pad their bids to give themselves a negotiating "cushion" which will permit them to make subsequent concessions and still salvage some of their profit margin. Diana Granitto, *Bid Shopping,* Contractor, June 1989, at 45.

On July 12, 1993, the Nevada Legislature passed Senate Bill 474. S.B. 474 is Nevada's subcontractor listing law, requiring general contractors bidding on public works projects to include in their bid the names of major subcontractors, and narrowly circumscribing the grounds upon which a listed subcontractor can later be substituted out of the project. In enacting S.B. 474, the legislature announced that it

> finds and declares that it is the policy of this state to ensure that the public receives the full benefits of fair competition among contractors and subcontractors in public works and has therefore enacted NRS 338.140 [sic][13] to limit the practice of shopping for bids for the construction, alteration and repair of public improvements.

Act of July 12, 1993, ch. 514, § 1, 1993 Nev. Stat. 2130 (codified in part at Nev.Rev.Stat. Ann. § 338.144 (Michie 1994)).

Before voting on S.B. 474, the legislature solicited testimony from interested citizens. Senator O'Connell, chair of the Nevada State Senate Committee on Government Affairs, which had jurisdiction over S.B. 474, requested Ms. Pamela Miller, a lobbyist for the Associated General Contractors of America ("AGC") (an organization which, presumably, would not tend to exalt the interests of subcontractors over those of general contractors) to "outline" the bill as reported out of his committee.

On May 5, 1993, Ms. Miller testified before the Committee on Government Affairs. Ms. Miller portrayed S.B. 474 as an attempt to reconcile the concerns of the various groups involved in soliciting, bidding, contracting, and executing public works construction projects. Ms. Miller read Section 1 of S.B. 474 (quoted in full, *supra* ) as expressing the legislative judgment "that bid shopping is not a practice the state wants as part of public works projects." She further informed the Committee that "the construction industry believes bid shopping gives an unfair advantage to those involved [i.e. general contractors who shop bids and subcontractors who peddle bids], is unethical and is adamantly opposed to the practice." Hearings on S.B. 474 before the Comm. on Gov't Affairs, 67th Nev.Legis.Sess. (1993).

Ms. Miller reappeared before the Committee on May 24, 1993, to give further testimony in support of S.B. 474. Once again, Ms. Miller read Section 1 to imply that the legislature considered bid shopping "not an ethical practice," and that "it shall not be done during the bidding procedure." Ms. Miller explained S.B. 474 as "an attempt to accommodate the small contractor and offer protection to subcontractors on public works jobs." Hearings, *id.* The Committee also heard from Mr. Chris Denning, a member of the Las Vegas chapter of the AGC. Mr. Denning testified he had personally worked with Ms. Pamela Miller, the AGC's lobbyist, on the amended language of S.B. 474, and he urged the Committee to support the bill. *Id.* Mr. Denning's opinion was echoed by Mr. Jesse Paulk, a Las Vegas general contractor, by Mr. Jack Jeffrey of the Southern Nevada Building and Trade Council, by Mr. Alan Glover, a lobbyist for Helms Construction,

ping never accrue to the owner); (7) reduced competition among general contractors, and hence increased costs to the public, caused by the unfair advantage to shopping generals, who will underbid non-shopping generals by artificially reducing their prime bids in the expectation of post-award concessions from listed subs; and (8) the risk to the awarding authority, and hence the public, that victimized subcontractors will resort to the use of inferior materials and methods in an attempt to protect profit margins reduced by bid-shopping. *See also generally* Michael L. Closen & Donald G. Weiland, *The Construction Industry Bidding Cases,* 13 John Marshall L.Rev.

565 (1980); Joe C. Creason, Jr., Note, *Another Look at Construction Bidding and Contracts at Formation,* 53 Va.L.Rev. 1720 (1967).

**13.** The citation appears to be a typographical error; Nev.Rev.Stat. § 338.140, originally enacted in 1967, is the statute prescribing certain limits on the method of composition and the contents of public documents soliciting bids on public works construction projects. S.B. 474 was a new statute, enacted for the first time in 1993, and was eventually codified at Nev.Rev. Stat. § 338.144.

and by Ms. Elaine McNeil, representing the Southern Nevada and Sierra Nevada chapters of the Associated Builders and Contractors.

The Nevada State Senate approved S.B. 474 by a vote of 20–1–0; the Nevada State Assembly approved the bill by a vote of 42–0–0. S.B. 474 became effective October 1, 1993.

Under the terms of this statute, a listed subcontractor on a public works contract may be replaced after the awarding of the general contract if the awarding authority itself objects to the original subcontractor, requests in writing that the prime contractor find a replacement subcontractor, and absorbs any resultant increase in cost. Absent an objection by the awarding authority, a listed subcontractor may be replaced only with the approval of the awarding authority, which approval may be granted only on one of the following grounds:

> (1) The subcontractor, after having a reasonable opportunity, fails or refuses to execute a written contract with the contractor *which was offered to the subcontractor with the same terms that all other subcontractors on the project were offered;*
>
> (2) the named subcontractor files for bankruptcy or becomes insolvent; or
>
> (3) the named subcontractor fails or refuses to perform h[er] subcontract within a reasonable time or is unable to furnish a performance and payments bond pursuant to NRS 339.025.

Nev.Rev.Stat. § 338.144(3)(b) (emphasis supplied).

As the court noted in its prior Order dated September 19, 1996 (Doc. # 10), Defendant Krump Construction offers no evidence that grounds (2) or (3) should permit it to substitute Buehner Corporation and Bragg Crane for Plaintiff Clark Pacific; Krump's only colorable claim of valid substitution must fall within ground (1). The court's dilemma concerns the proper construction of this portion of the listing statute. Quite obviously, a literal application of ground (1) would lead to absurd results: It is utterly impossible, for example, that the listed electrical subcontractor will be offered a contract "with the same

terms that all other subcontractors on the project" will be offered. The electrical subcontract's terms will necessarily differ from the plumbing subcontract's terms, the structural steel subcontract's terms, and so on. Each subcontract with each different building trade will contain very different terms. The electrical subcontract will contain no references to toilets or sewers, the plumbing subcontract will contain no terms regarding fire and smoke detectors, the structural steel subcontract will contain no specifications for electrical conduits, and so on. A literal reading of Nev.Rev.Stat. § 338.144(3)(b)(1) would therefore prevent general contractors *ever* from justifying substitution of a listed subcontractor on the grounds that after having had a reasonable opportunity the subcontractor failed or refused to enter into an agreement on the same terms as offered all other project subcontractors: There will *never* be a public works construction project on which all subcontractors will be offered contracts on identical terms.

■ The court has jurisdiction over the subject matter of this action by virtue of the diversity of the citizenship of the parties. 28 U.S.C. § 1332. The court is therefore bound to apply the substantive law of the State of Nevada. 28 U.S.C. § 1652; *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Gee v. Tenneco, Inc.,* 615 F.2d 857 (9th Cir.1980). The court is unfortunately faced with the unusual problem of construing a Nevada statute, unaided by previous construction by courts of the State, whose "articulation of the rule or policy is so incomplete that it cannot clearly be said to speak to the situation in issue." 2A *Sutherland Statutory Construction* § 45.08, at 42 (5th rev. ed. 1992). Courts must ordinarily construe statutory language according to its literal meaning, but an exception to that rule obtains where literal interpretation would produce absurd results. *Nesovic v. United States,* 71 F.3d 776, 778 n. 3 (9th Cir.1995).

■ Where an issue arises within a general area covered by the statute but with respect to that issue the legislative pronouncement is so defective as to preclude rational application, the court must discern the applicable legislative intent by what is necessarily

an act of projection, starting from the areas where legislative intent is readily discernible, and projecting to fair and reasonable corollaries of that intent for the specific issue before the court. *Montana Power Co. v. Federal Power Comm'n,* 445 F.2d 739, 746 (D.C.Cir.1970) (en banc). As Judge Learned Hand wrote, where literal application of statutory language results in the stultification of the statutory scheme, "[c]ourts have not stood helpless in such situations; the decisions are legion in which they have refused to be bound by the letter, when it frustrates the patent purpose of the whole statute.... [the court] must remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945) (*quoted in Heppner v. Alyeska Pipeline Serv. Co.,* 665 F.2d 868, 870 (9th Cir.1981)); *see also Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 454–55, 109 S.Ct. 2558, 2566–67, 105 L.Ed.2d 377 (1989); *Watt v. Alaska,* 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1678 n. 9, 68 L.Ed.2d 80 (1981); *Sacks v. Commissioner, IRS,* 69 F.3d 982, 992 (9th Cir.1995).

■ When, as here, the literal import of the statutory text is inconsistent with legislative intent, it is within the power of the court to modify the words of the statute to conform to that intent. 2A *Sutherland Statutory Construction* § 46.07, at 126.

■ Because it was the apparent purpose of the Nevada legislature in enacting S.B. 474 to prevent bid-shopping in public works contracts, the court must read Nev. Rev.Stat. § 338.144(3)(b)(1) to give effect to that purpose. Adherence to the literal meaning of (3)(b)(1) would frustrate utterly that legislative intent. If the statutory language is ambiguous or otherwise unclear, a court should not stifle its underlying policy by means of pedantic or grudging construction. *Addison v. Holly Hill Fruit Prods.,* 322 U.S. 607, 614, 64 S.Ct. 1215, 1219–20, 88 L.Ed. 1488 (1944). A court may, indeed should, go beyond the literal language of a statute if reliance on that language would defeat the statute's plain purpose. *Bob Jones Univ. v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 2025–26, 76 L.Ed.2d 157 (1983). The court will construe the words of the statute in light of the clear, strong purpose indicated by the legislature in the preamble, and adopt an interpretation which will serve to realize the statute's evident goals. *Brothers v. First Leasing,* 724 F.2d 789, 793 (9th Cir.1984).[14]

■ But the court need not construe in a vacuum: At the time the Nevada Legislature enacted S.B. 474, numerous other states had adopted subcontractor listing statutes; indeed it seems from the considerable similarity of language among these statutes to be likely that Nevada copied its listing statute from that of another state. *Connecticut Humane Soc'y v. Freedom of Information Comm'n,* 218 Conn. 757, 591 A.2d 395 (1991); *Friends of Mammoth v. Board of Supervisors,* 104 Cal.Rptr. 16, 500 P.2d 1360 (1972). Where such similarity exists, the language of the statutes of other jurisdictions may aid in determining the general policy and objectives of the statute under consideration. In such a way may uncertain words "be wrought into consistency and unity with a legislative policy which is itself a source of law." *Van Beeck v. Sabine Towing Co.,* 300 U.S. 342, 350–51, 57 S.Ct. 452, 456, 81 L.Ed. 685 (1937).

To that end, the court will consider the language employed by other jurisdictions seeking to address the evil of bid-shopping in the context of public works construction contracts.

---

**14.** The ancient roots of this principle are commonly located in Lord Coke's formula whereby "four things are to be discerned and considered:"

　1st. What was the common law before the making of the act.

　2nd. What was the mischief and defect for which the common law did not provide.

　3d. What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth.

　And, 4th. The true reason of the remedy; and then the office of all the Judges is always to make such construction as shall suppress the mischief, and to suppress subtle inventions and evasions for continuance of the mischief, and pro privato commodo, and to add force and life to the cure and remedy, according to the true intent of the makers of the Act, pro bono publico.

*Heydon's Case,* 76 Eng.Rep. 637, 638 (Ex. 1584).

In Delaware, a winning general contractor may not substitute a listed sub without written consent of the awarding authority, and such consent may be given only if the authority is

> satisfied that the subcontractor in question whose name is listed in the successful bidder's accompanying statement is unqualified to perform the work required, or has failed to execute a *timely reasonable subcontract*, or has defaulted in the performance of the part of the work covered by the subcontract or is no longer engaged in such business.

Del.Code Ann. tit. 29, § 6911 (1995) (emphasis supplied). Connecticut's listing law provides that

> [t]he awarding authority shall not permit substitution of a subcontractor for one named in accordance with the provisions of this section or substitution of a subcontractor for any designated subtrade work bid to be performed by the general contractor's own forces, except for good cause. The term "good cause" includes but is not limited to a subcontractor's, or, where appropriate, a general contractor's ... failure to perform h[er] agreement to execute a subcontract under section 4b–96.

Conn.Gen.Stat. § 4b–95 (1995).

In Alaska,

> A bidder may replace a listed subcontractor if the subcontractor ... fails to execute a contract with the bidder involving performance of the work for which the subcontractor was listed *and the bidder acted in good faith* ...

Alaska Stat. § 36.30.115(b) (emphasis supplied).

The subcontractor listing statutes enacted in California and New Mexico are the statutes which most closely resemble Nevada's statute. The New Mexico statute provides

> No contractor whose bid is accepted shall substitute any person as subcontractor in place of the subcontractor listed in the original bid, except that the using agency shall consent to the substitution of another person as a subcontractor.... when the subcontractor listed in the bid, after having had a reasonable opportunity to do so,

fails or refuses to execute a written contract, when such written contract, *based upon the general terms, conditions, plans and specifications for the project involved or the terms of such subcontractor's written bid*, is presented to h[er] by the contractor....

N.M.Stat.Ann. § 13–4–36 (Michie 1996) (emphasis supplied). The relevant portion of the California statute prohibits the substitution of listed public works subcontractors absent consent by the awarding authority on the ground that

> the subcontractor listed in the bid after having had a reasonable opportunity to do so fails or refuses to execute a written contract, *when that contract, based upon the general terms, conditions, plans and specifications for the project involved or the terms of that subcontractor's written bid*, is presented to the subcontractor by the prime contractor.

Cal.Pub.Con.Code § 4107(a)(1) (West 1996).

It is the legal judgment of the court that Nev.Rev.Stat. § 338.144(3)(b)(1) must be read to permit a public works general contractor to substitute a listed subcontractor where, after having had a reasonable opportunity the subcontractor fails or refuses to execute a written subcontract presented to it by the general contractor, where the terms of that proposed subcontract are in reasonable conformity to the terms of the listed subcontractor's original bid. Judicial adherence to the literal command of the statute, as written, would produce absurd results. The court's reconstruction of the statute will serve to effectuate the documented intent of the legislature to prevent bid-shopping by narrowing the extent of post-award negotiations between general contractor and subcontractor: Certainly the parties may conduct negotiations on the terms of the subcontract after bid day, but the general contractor may not rely upon § 338.144(3)(b)(1) to substitute a listed subcontractor where the only subcontract offered by the general contractor to such listed subcontractor contains terms radically less favorable to the subcontractor than the terms of that subcontractor's bid.

The court well knows that merely by listing a particular subcontractor in its bid, the bidding prime contractor does· not thereby enter into a contract with the listed subcontractor. *Interior Sys. Inc. v. Del E. Webb Corp.,* 121 Cal.App.3d 312, 175 Cal. Rptr. 301 (1981); *Norcross v. R.W. Winters,* 209 Cal.App.2d 207, 25 Cal.Rptr. 821 (1962). The subcontractor listing law does not work such a radical revision of the common law of offer and acceptance. It does, however, impose pseudo-contractual obligations on the parties. A general contractor who lists a particular subcontractor in its bid on a public works project does thereby betroth itself to that subcontractor. Absent circumstances justifying substitution on one or more of the statutory grounds for substitution set out in Nev.Rev.Stat. § 338.144(3)(b), the contractor and subcontractor must eventually enter.into a binding subcontract. To this extent the statute links the two parties together; though they have no contract on bid day, they are now bound to one another, and may disengage only on one or more of the specific statutory grounds. To this extent the statute works a substantive change upon the common-law rules as they apply in the context of public works contracting, and attempts to level the playing field which is otherwise tilted, both by the general contractor's position as the owner of the prime contract, and by the general contractor's

common-law rights as defined by *Drennan v. Star Paving, supra.*[15]

The court finds that Clark Pacific has demonstrated, in the course of the preliminary injunction hearing, a substantial likelihood that it could prove, at trial of the merits of this action, that. its post-bid-day behavior does not justify its substitution under the court's reconstructed reading of Nev.Rev. Stat. § 338.144(3)(b)(1). The court cannot say, on the basis of the evidence adduced to date, that the terms of the only subcontract ever offered to Clark reasonably conformed to the terms of its bid. Krump Construction's proposed subcontract would have both reduced the base price of Clark Pacific's bid by $10,000.00 and increased substantially the scope of work to be performed by Clark Pacific, at no additional compensation.,

During the hearings on Plaintiff's Motion for Preliminary Injunction, Defendant Krump Construction argued repeatedly that Clark Pacific's bid was "unacceptable," and that its representatives had, prior to bid-time, "taken exception" to numerous items in Clark Pacific's bid. These arguments seem to the court entirely beside the point. Prior to bid-time, Krump Construction was under no obligation whatsoever to "accept" any of the terms in Clark Pacific's bid. Prior to bid time, it would have been entirely appropriate

**15.** Defendants have insisted throughout the course of this litigation that Clark Pacific enjoys neither common-law contract rights nor any right of action under the Nevada subcontractor listing statute. Defendants have attempted to highlight the differences between Nevada's statute and the statutes of California and New Mexico, notably the existence in those statutes of provisions guaranteeing a listed subcontractor notice and an opportunity to be heard prior to substitution. Such a distinction, in the court's view, has no bearing on the question of the substantive right not to be substituted except on specific factual grounds.

Defendants have resisted mightily the notion that Nev.Rev.Stat. § 338.144 has worked a real change in the law, and therefore in the way Defendants must conduct their business henceforth. Defendants, for example, have in their papers cited the court to the Nevada Supreme Court's decision in *Gulf Oil Corp. v. Clark County,* 94 Nev. 116, 575 P.2d 1332 (1978) as support for the proposition that Plaintiff Clark Pacific possesses no right whatever with respect to its bid or any subcontract.

First, that case was decided fifteen years prior to the enactment of the anti-bid-shopping statute. Second, *Gulf Oil* stands only for the unexceptionable proposition that a bid in response to a solicitation therefor constitutes only an offer, and until its acceptance imposes no contractual obligation upon the offeree. In the present action, Clark Pacific is not suing on a contract, but on its statutory right not to be substituted out of business except on statutorily valid grounds. Defendants have also cited *Douglas County Bd. of County Comm'rs v. Pederson,* 78 Nev. 106, 369 P.2d 669 (1962). Again, this case predates the anti-bid-shopping statute by more than three decades, and constitutes authority only for the proposition that a writ of mandamus will not lie against a public body for the purpose of forcing the exercise of its lawful discretion in a particular manner. In the present action, the claim is that Mr. Raecke granted Krump Construction's request to substitute another contractor for Clark Pacific in violation of the specific terms of a state statute which *divests* him of discretion.

for Krump Construction to have informed Clark Pacific, in no uncertain terms, that unless Clark Pacific agreed to remove or modify the offending bid items, such as the construction of access roads, the provision of temporary heat, the supplying of deadmen, or the specific schedule dates and durations, that Krump Construction would not submit Clark Pacific's name as precast concrete subcontractor in Krump's prime bid. Krump Construction did no such thing. It may have voiced objections to items in Clark Pacific's bid, but it did not condition its use of the bid on any such modifications or concessions by Clark Pacific. Once having listed Clark Pacific, Krump Construction in effect subjected itself to the limits on post-award negotiations set out in the statute. Krump Construction simply cannot have it both ways: Either Clark Pacific's bid was "unacceptable," in which case it could have decided not to list Clark Pacific despite Clark Pacific's attractive base price, or the bid was "acceptable," within reasonable limits, and the use of Clark Pacific's bid in Krump's own prime bid married the two contractors for the life of the project, and narrowed the grounds of any subsequent divorce to those specifically prescribed by statute.

Witnesses for Krump Construction also testified that the terms of Clark Pacific's bid departed significantly from the terms set out in the owner's bid solicitation documents, and that therefore Krump was entitled to stonewall Clark Pacific's attempts to write its own ticket. But the bid solicitation documents expressly (1) permit the general contractor to divide the various work divisions among the various subcontractors in the exercise of the general contractor's discretion [16] and (2) permit subcontractors to bid either an entire work division, following precisely the terms of the owner's division of work, *or* to bid a work division with such exceptions and qualifications as the subcontractor makes, in writing, in its bid form. Once again, if Krump Construction found unacceptable any or all of Clark Pacific's written special conditions and qualifications, it behooved Krump Construction to resolve its objections to the manner in which Clark Pacific proposed to perform specified construction tasks, and to the precise scope of the work on which Clark Pacific bid *prior to listing Clark Pacific in Krump Construction's prime bid.*

Krump Construction's president, Mr. Ron Krump, testified that he believed the statute imposed absolutely no limits on post-award negotiations between a winning general contractor and its listed subcontractors. In Krump's view, the terms of the subcontract bid, and the fact that a general contractor makes use of the sub-bid in its own prime bid, have no relevance to, and do not in any way restrict the scope of, post-award negotiations. Acceptance of this argument would eviscerate the listing statute, and render pre-award subcontractor listing meaningless. If the subcontractor gains from the statute no protection from over-reaching during post-award negotiations, what is to prevent a winning general contractor from, for example, demanding that the listed subcontractor reduce its price by half, or lose the subcontract? What prevents such a general contractor from demanding that a listed subcontractor promise to complete its work in half the time provided in its bid, for no additional compensation? [17] If the statute is to have

---

**16.** Subsection 2.1.5 of the "General Conditions of the Contract" contained in the State's Project Manual (Vol. I) provides that

> [t]he organization of the Specifications into divisions, sections, or articles, and the arrangement of the Drawings shall not control the Contractor in dividing the Work among Subcontractors, or in establishing the extent of work to be performed by any trade.

**17.** For example, when, on July 3, 1996, Rusty Heberger telephoned Don Clark with the news that Krump would not agree to the schedule Krump itself had provided Clark Pacific at the June 26 meeting, and would not abide by Clark Pacific's bid items requiring Krump Construction to provide access roads or temporary heat, Mr. Heberger concluded the conversation by telling Mr. Clark that "these items are non-negotiable. Either you agree to them, or we go the next step," implying that either Clark Pacific caved into Krump's demands, whether or not in reasonable conformity to Clark Pacific's bid, or Krump Construction was prepared to substitute Clark Pacific off the Lovelock project.

It appears to the court that negotiation via an ultimatum through which a general contractor attempts to extract an agreement from a listed subcontractor on terms wildly different from the terms as bid constitutes one of the chief evils to be avoided by the subcontractor listing law.

any force, it must be read to confine post-award negotiations to within reasonable limits.

Mr. Don Clark testified that he did not believe the subcontractor listing statute completely forecloses all post-award negotiations between a winning general and a listed sub. He recognized that even after bid-day, some such negotiations will be necessary. Mr. Clark testified that, in his opinion, listed subs should be prepared to negotiate subcontract terms which depart from the terms of a sub's bid by as much as five per cent of the total sub-bid price. Given his testimony that Clark Pacific builds a profit margin of approximately 16% into its sub-bids, a reduction of five per cent in the overall price of the subcontract would appear to permit substantial give-and-take during negotiations, without exposing the listed subcontractor to outright gouging by a general contractor, or exposing the public to the risk that a subcontractor who has caved in to the general contractors' post-award demands will attempt to cut corners so deeply that the quality of the finished project will suffer dramatically. While the court hesitates to read Mr. Clark's five per cent rule into the language of the statute, such a figure does appear, at least under the facts of the present dispute, to provide a useful yardstick by which to measure the legitimacy of Krump Construction's post-award contract negotiation demands.

Clark Pacific analyzed the cost differential between its bid and Krump Construction's proposed subcontract, and calculated that Krump Construction's demands for concessions would translate into additional costs to Clark Pacific of between $311,000.00 and $402,000.00. These figures include the additional cost of providing deadmen, of advancing the erection start date by 14 days, of reducing erection time by 28 days, of maintaining access roads, of providing power for its welders, of providing temporary heat for curing grout, and of obtaining Errors and Omissions insurance coverage. Other than agreeing to shoulder perhaps half the cost of welding power, Krump Construction refused during post-award negotiations to modify any of these demands, all of which were expressly contradicted by the terms of Clark Pacific's original bid. If the court assigns a value to these demands by Krump at a point halfway between Clark Pacific's low and high estimates, the cost of Clark Pacific's agreement to these terms would have been in the neighborhood of $350,000.00, an amount equal to approximately eight per cent of Clark Pacific's total bid price, and equal to nearly half Clark Pacific's built-in margin. Because at the time of negotiations Krump Construction had already been awarded the prime contract, at a set price, this $350,000.00 would represent pure additional profit to Krump Construction, and zero benefit to the State.[18] This in addition to the approximately $225,000 already included by Krump in its prime bid to cover the cost of providing deadmen, electrical welding power, and temporary heat—which Buehner and Bragg Crane are to provide under their agreements with Krump.

## III. Preliminary Injunction

Clark Pacific claims that Krump Construction has, with the approval of the Public Works Board, replaced it as precast concrete subcontractor in violation of Nev.Rev.Stat. § 338.144(3). Because the Board has never requested that Clark Pacific be substituted, and because Krump Construction makes no claim that Clark Pacific has filed a petition in bankruptcy, become insolvent, or failed to perform its subcontract, see Nev.Rev.Stat. § 338.144(3)(b)(2) and (3), the substitution of Clark Pacific by Buehner and Bragg Crane is valid only if, under the court's reformulation of the statute, Clark Pacific has, after having had a reasonable opportunity, failed or refused to execute a written subcontract of-

---

18. On the other hand, performance of the precast concrete portion of the Lovelock Project by Buehner Corporation and Bragg Crane would relieve the State of its obligation to compensate the precast supplier and/or contractor for the fifty-day acceleration of the project occasioned by the Project Architect's mistaken designation, in the owner's solicitation documents of a 380-day total contract duration, rather than 330 days. Krump Construction would have passed the additional costs of such acceleration onto the State; Clark Pacific reckoned the cost of its own acceleration at $151,000.00. By allowing the substitution, the State may have been attempting to save itself this additional cost.

fered to it by Krump Construction on terms reasonably conforming to the terms of Clark Pacific's subcontract bid. If not, there may have been a violation of the statute. Because the statute creates valuable entitlements in listed subcontractors, Clark Pacific's putative wrongful substitution may also give rise to liability for a violation of Clark Pacific's Due Process rights to property created by operation of state law.

### A. Right of Action and Scope of Available Relief

■■■ Both Krump Construction and Mr. Raecke have argued in these proceedings that the statute in question was not designed for the protection of subcontractors, and therefore creates no right of action in Clark Pacific. The court has already ruled on this issue in its Order dated September 19, 1996 (Doc. # 10) granting Clark Pacific a temporary restraining order. Under Nevada law, where a state statute creates an entitlement but does not expressly provide a remedy for its deprivation, a Nevada court will infer an appropriate remedy. *Builders Ass'n v. City of Reno,* 105 Nev. 368, 776 P.2d 1234, 1235 (1989) (citing *Student Coalition for Peace v. Lower Merion Sch. Dist.,* 776 F.2d 431, 440 (3d Cir.1985)).

■■■ Because the clear purpose, as revealed by both Section 1 of S.B. 474, the bill which became the statute, and by the legislative history of the statute, is the protection of the public and of listed subcontractors from the evils of bid-shopping, Nev.Rev.Stat. § 338.144 confers the right upon a listed subcontractor to perform the contract unless there exist statutory grounds for a valid substitution. *Southern California Acoustics Co. v. C.V. Holder, Inc.,* 71 Cal.2d 719, 79 Cal. Rptr. 319, 323–25, 456 P.2d 975, 979–81 (1969) (Traynor, C.J.). In addition to relief in the form of money damages for the wrong-

ful substitution, *Southern California Acoustics, ibid,* the injured subcontractor may be entitled to injunctive relief against the prime contractor and the awarding authority. *PG Constr. Co. v. George & Lynch, Inc.,* 834 F.Supp. 645, 658–59 (D.Del.1993); *Haddock v. Board of Pub. Educ.,* 84 A.2d 157, 162–64 (Del.Ch.1951).[19]

Clark Pacific seeks a preliminary injunction against both Krump Construction and Mr. Eric Raecke, Manager of the Nevada Public Works Board. Clark Pacific seeks (1) an order enjoining the substitution of any person in its place as precast concrete subcontractor on the Lovelock Correctional Facility Phase II project, (2) an order enjoining Krump Construction and Nevada Public Works Board Manager Raecke from negotiating with, contracting with, or permitting any subcontractor or supplier other than Clark Pacific to perform any portion of the work described in Clark Pacific's June 18, 1996 bid, and (3) an order enjoining Mr. Raecke from approving any request from Krump Construction, Buehner Corporation, or Bragg Crane to approve any shop drawings, material supplier submittals, designs or any other matter relating to Clark Pacific's proposed scope of work on the project which requires the approval of the Public Works Board or the Project Architect.

It is therefore the judgment of the court that the equitable relief sought herein by Clark Pacific is of the type available to subcontractors under the statute.[20]

### B. Standard for Preliminary Injunction

■■■ A party seeking a preliminary injunction under Fed.R.Civ.P. 65 must make a persuasive showing of irreparable harm (in other words, that money damages alone will not suffice to restore the moving party to its rightful position), and a substantial likelihood

---

19. Clark Pacific asserts claims both directly under Nev.Rev.Stat. § 338.144, and for violation of its Fourteenth Amendment Due process rights to a property interest created by that statute. Because the court finds Clark Pacific to have made a substantial showing of its right to relief under the statute itself, it appears unnecessary at this time to address the merits of Clark Pacific's Due Process claim.

20. Defendants have not contested Plaintiff's standing to bring the instant action. The Supreme Court of Nevada has indicated that a responsible low bidder on a public works subcontract may have standing to challenge violations of state statutes regulating the public works contract bidding process. *Gulf Oil Corp. v. Clark County,* 94 Nev. 116, 575 P.2d 1332, 1333–34 (1978).

that it will prevail on the merits of the underlying action. *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977); *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Triad Sys. Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330 (9th Cir.1995); *Metro Pub., Ltd. v. San Jose Mercury News*, 987 F.2d 637 (9th Cir.1993); *see also Big Country Foods, Inc. v. Board of Educ.*, 868 F.2d 1085, 1088 (9th Cir.1989) (requiring party moving for preliminary injunction to show *either* probable success on merits and irreparable harm *or* that "serious questions are raised and the balance of hardships tilts sharply in its favor"); *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir.1987). These requirements represent "different points on a sliding scale" on which the requisite degree of irreparable harm increases as the probability of success on the merits decreases. The party requesting exercise of the court's extraordinary equitable power must demonstrate a significant threat of irreparable injury regardless of the magnitude of the injury. *Big Country Foods, ibid.*

### C. Irreparable Harm

█ Clark Pacific has satisfied the court that absent a preliminary injunction *pendente lite* it cannot be made whole through an eventual award of money damages. In the construction industry, each project represents a unique opportunity to gain practical experience and to enhance one's reputation in the business. Denial of injunctive relief would permanently deprive Clark Pacific of this opportunity, on a four-and-a-half million dollar contract, to enhance its reputation in the precast concrete industry, and to improve its job performance through the gaining of valuable practical experience. *Cubic Western Data, Inc. v. New Jersey Turnpike Auth.*, 468 F.Supp. 59, 68 (D.N.J.1978).

Mr. Bruce Gordon, a Krump engineer, testified to the impossibility of attaching a reasonable dollar value to this experience. Clark Pacific's co-owner Don Clark testified that Clark Pacific had built a lower-than-usual profit margin into its bid on the Lovelock project for the precise purpose of increasing Clark Pacific's chances to carve out a toehold in the lucrative prison construction business through successful performance of this contract, its first prison construction job in Nevada.[21] *See Amoco Prod. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). If Clark Pacific wrongfully loses its opportunity to perform the precast erection portion of the Lovelock project, it may have lost its chance to become a player in the Nevada prison construction market for the foreseeable future.

An award of money damages would compensate Clark Pacific for the profits lost through being prevented from performing its subcontract. But a disappointed public works contract bidder claiming illegality in the bidding process alleges an injury beyond its economic loss of the contract. The bidder may also claim injury to its right to a legally valid public contract bidding process, which may be corrected by injunction. *Gulf Oil Corp. v. Clark County*, 94 Nev. 116, 575 P.2d 1332, 1333–34 (1978) (noting right of bidder on public works contract to bring timely action for injunctive relief to compel award of contract, and further noting compatibility of such action with public interest in enforcing compliance with Nevada's bidding statutes).[22]

---

**21.** Prison construction is a growth industry in this State. Mr. Robert Bayer, Director of the Nevada Department of Prisons, testified to the almost unmanageable rate at which Nevada's prison population grows month by month. Mr. Bayer testified that after completion of the Lovelock Correctional Facility Phase II project, at a cost of nearly thirty million dollars, the next item of his agenda is the construction, over the next several years, of a new correctional facility in southern Nevada, at a cost of more than seventy million dollars.

**22.** *See also National Maritime Union v. Commander, Military Sealift Command*, 824 F.2d

1228, 1237 (D.C.Cir.1987) (citing *CACI, Inc.– Federal v. United States*, 719 F.2d 1567, 1572–75 (Fed.Cir.1983); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 717–23 (2d Cir.1983); *Control Data Corp. v. Baldrige*, 655 F.2d 283, 293 (D.C.Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981); *American Fed'n of Gov't Employees, Local 1668 v. Dunn*, 561 F.2d 1310, 1313 (9th Cir.1977); *Merriam v. Kunzig*, 476 F.2d 1233, 1242 n. 7 (3d Cir.), *cert. denied*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973); *Keco Indus. v. United States*, 428 F.2d 1233, 1236–38, 192 Ct.Cl. 773 (1970)); *see also Clark Constr. Co. v. Pena*, 895 F.Supp. 1483, 1493 (M.D.Ala.1995) (finding right to fair and equal

In addition, some courts have held that the very violation of fundamental constitutional rights [23] can by itself satisfy the requirement of irreparable harm. *Gutierrez v. Municipal Court,* 838 F.2d 1031, 1035 (9th Cir.1988); *Cunningham v. Adams,* 808 F.2d 815, 822 (11th Cir.1987); *Deerfield Medical Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981).

Clark Pacific may not be the only party to suffer irreparable harm through the denial of the preliminary injunction. Krump Construction and the Nevada Public Works Board, through its Manager, Eric Raecke, have apparently already determined to replace Clark Pacific as precast concrete subcontractor on the Lovelock prison construction project. Denial of injunctive relief will *de facto* permit Krump Construction and the State to engage another precast concrete subcontractor. If Clark Pacific prevails on the merits, that judgment will render the agreement entered into between the substitute subcontractor and the general contractor illegal. Enjoining the substitution therefore protects Plaintiff's and the public's interest in a lawful bidding process,[24] and ensures the eventual execution and performance of a lawful contract.

*Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 372 (8th Cir.1991).

Finally, in passing on the question of irreparable injury, the court must not ignore the people of Nevada, whose thirty million dollars are, after all, at stake in this matter. The Lovelock Correctional Facility belongs to them, and one of the "benefits of fair competition among contractors and subcontractors in public works" is sound construction (of the bricks and mortar variety, rather than the statutory kind). Buehner Corporation is Krump's choice to perform what must indisputably be the core of this project—the erection of the new buildings' floors, walls and ceilings.

Krump chose Buehner in order to pocket an extra half-million dollars [25] Buehner, whose financial distress was well known to Krump on June 24, 1996, accepted a subcontract to perform the work it had originally bid on June 18, 1996, for $363,000 less.[26] If Buehner performs the work, and is forced through penury to attempt to cut costs by purchasing cheaper materials, and/or rushes its workforce through the project in order to incur lower labor costs, the result may well

treatment in public works contract bidding process adequately protected *only* by injunctive relief); *Funderburg Builders, Inc. v. Abbeville County Memorial Hosp.,* 467 F.Supp. 821, 824 (D.S.C. 1979) (finding "better view" to provide equitable relief to responsible low bidders under state bidding statutes).

**23.** *See, e.g., Pataula Elec. Membership Corp. v. Whitworth,* 951 F.2d 1238, 1243 (11th Cir.) (recognizing protected property right of contractor bidding on public works project where contractor's interest, in the form of a contract, derives from state law, and quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)), *cert. denied,* 506 U.S. 907, 113 S.Ct. 302, 121 L.Ed.2d 225 (1992). The showing of such clear illegality may justify enjoining a government contract decision. *Coco Bros., Inc. v. Pierce,* 741 F.2d 675, 679–680 (3d Cir.1984).

**24.** The Nevada legislature explicitly declared that its purpose in enacting Nev.Rev.Stat. § 338.144 was "to ensure that the public receives the full benefits of fair competition among contractors and subcontractors in public works." Act of July 12, 1993, ch. 514, § 1, 1993 Nev.Stat. 2130 (co-

dified in part at Nev.Rev.Stat.Ann. § 338.144 (Michie 1994)).

**25.** Clark Pacific introduced evidence that Buehner had originally (and improperly, given its lack of a Nevada subcontractor's license) bid $5.03m to perform precast concrete panel fabrication and delivery, as well as erection, aligning, welding and grouting of the panels by Bragg Crane. Following the Public Works Board's final approval on August 13, 1996 of Krump's request to substitute Buehner and Bragg Crane for Clark Pacific, Krump signed a purchase order and subcontract with Buehner and Bragg Crane, respectively, for $4.465m, which agreements covered the perhaps $125,000 cost to Krump for providing the deadmen, welding power, and temporary heat excluded from the work Clark Pacific had bid on. Had Krump agreed to pay Clark Pacific that $125,000 in addition to Clark Pacific's base price of $4.625m, Krump's total precast concrete cost would have been $4.75m. In other words, Krump saved at least $285,000 from the substitution.

**26.** Buehner's own portion of its joint bid with Bragg Crane on June 18 amounted to $3.778m. Buehner's purchase order executed after the state approved the substitution was in the amount of $3.415m.

be an inferior product, and the people of this State may have purchased a thirty-million dollar lemon. Once the prison is built, the harm from having invested in a substandard facility will be impossible to undo.

To this extent, at least, the harm to be avoided by the grant of equitable relief would be irreparable: An order temporarily restraining the State and Krump Construction and its substitute subcontractor will (1) protect Clark Pacific's interest in gaining invaluable experience and industry goodwill, *see Cubic Western Data, Inc. v. New Jersey Turnpike Auth.*, 468 F.Supp. 59, 68 (D.N.J. 1978); (2) avoid rendering at least partly ineffective a possible judgment on the merits in favor of Clark Pacific, *Aqua–Tech, Inc. v. Como Lake Protection and Rehabilitation Dist.*, 71 Wis.2d 541, 239 N.W.2d 25, 30 (1976); [27] (3) protect both Clark Pacific's and the public interest in a lawful bidding process, and the execution of a lawful public works contract, *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991); and (4) prevent the construction of a prison whose quality may be substantially impaired if the precast concrete subcontractors resort to excessive corner-cutting in order to avoid ruin at the hands of an unscrupulous and extortionate general contractor.

**D. Likelihood of Success**

 Clark Pacific has also satisfied the court with respect to the likelihood of its prevailing on the merits of this action. Barely 48 hours after winning the prime contract, Defendant Krump Construction began to exert pressure on Clark Pacific to make deep concessions in order to keep the subcontract; within one day of submitting its proposed subcontract Krump Construction threatened to substitute Clark Pacific off the project if it would not cave in to Krump's demands. In

the period between the opening of the sealed prime bids on June 18, 1996 and the date Public Works Board Manager first approved Krump Construction's request to substitute Buehner for Clark Pacific on July 22, 1996, Krump employed various dilatory tactics. Perhaps these tactics were in aid of some strategy to buy Krump time to conclude a sweeter deal with Buehner and Bragg Crane. Perhaps Krump sought to strengthen its bargaining position vis-a-vis Clark Pacific, as the latter invested more and more time and money in drawings and engineering. Perhaps Krump all along had its corporate eye on the "reasonable opportunity" language in the statute; after a decent interval Krump could innocently plead its case for substitution with the Public Works Board, claiming that Clark Pacific's obstinacy threatened the swift completion of this important "fast-track" public project, hoping the Board's manager would not conduct too extensive an inquiry into precisely what caused the apparent impasse between general and sub.

Whatever the reason, Construction evaded Clark Pacific's phone calls and faxes, failed to "get back" to Clark Pacific despite their promises. Despite Krump's considerable comfort with the use of electronic document transmission technology, delays of a week or more crept into the negotiations between Krump and Clark Pacific, always delaying the conveyance of a document of more than tangential importance: Both the subcontract itself, and the crucial revised schedule of work seemed to travel, not at the speed of light, but at the speed of molasses on a cold day in northern Nevada.

Clark Pacific has made a substantial showing that all these delays, perhaps resulting from one or more of these strategies, or all of them in conjunction, effectively denied it a

**27.** *Cf. Sims Varner & Assocs., Inc. v. Blanchard,* 794 F.2d 1123 (6th Cir.1986) (noting "substantial completion" of the disputed contract work to present "very serious obstacles" to the grant of injunctive relief); *cf. also Glacier Park Found. v. Watt,* 663 F.2d 882 (9th Cir.1981) (affirming denial of preliminary injunction where future relief could be awarded plaintiff contractor who had lost a public concessions contract in the form of reimbursement for work already done); *Delta Data Sys. Corp. v. Webster,* 755 F.2d 938, 939 (D.C.Cir.1985) (declaring injunction inappropri-

ate where government had, by the time of the decision, been proceeding under its contract with substitute subcontractor for over a year); *Southern Technologies, Inc. v. United States,* 755 F.Supp. 19, 20–21 (D.D.C.1991) (denying plaintiff subcontractor's motion for preliminary injunction where work had been nearly completed by the substitute subcontractor, thus (a) rendering it impossible to show irreparable harm to plaintiff and (b) tipping balance of hardships mightily in the government's favor).

"reasonable opportunity" to execute *any* subcontract, even leaving aside the question whether the quality of the offered subcontract weighs in the Section (3)(b)(1) calculus.

But, as the court has already indicated, Section (3)(b)(1) (as reinforced by the court in aid of its purpose) does require analysis of *what* contract a listed public works subcontractor must "fail[ ] or refuse[ ] to execute" before it may lawfully be substituted off the project. The only subcontract offered to Plaintiff contained terms which might reasonably be said to fall outside the permissible range for post-award subcontract negotiations. Clark Pacific has provided substantial evidence that the subcontract which requires it to accept terms increasing its obligations by close to half a million dollars worth of work on a four-and-one-half million dollar contract is not a subcontract in reasonable conformity with the terms of its bid.

Moreover, Clark Pacific has presented powerful evidence that, in fact, it may never have been Krump Construction's intention to negotiate with Clark Pacific in good faith over the terms of the proposed precast concrete subcontract. Krump Construction's exorbitant negotiation demands, its premature overtures to Buehner Corporation, its repeated delays in forwarding necessary information to Clark Pacific, its repeated attempts to string Clark Pacific along, knowing Clark Pacific to be engaged in expensive *travaux préparatoires* in connection with its impending work, by neglecting to respond to inquiries in a timely manner, all indicate to the court Krump Construction's apparent intent to play Clark Pacific against Buehner Corporation, after the award of the prime contract, in blunt opposition to the aims of the Legislature in enacting Nev.Rev.Stat. § 338.144.

It appears from the evidence that the actions of Krump Construction in attempting to extort post-bid concessions from Clark Pacific, and the actions of the Public Works Board in approving Krump Construction's request to award the subcontract to a substitute, may well have violated Clark Pacific's rights under both the state anti-bid-shopping statute and the Due Process Clause of the Fourteenth Amendment. Clark Pacific need not,

in making the requisite showing of a substantial likelihood of prevailing on the merits, prove that it will ultimately win this lawsuit. Where, as here, the party seeking preliminary injunctive relief has established irreparable injury, it is enough if there exists a strong likelihood, or a reasonable certainty, that Clark Pacific will prevail on the merits. *Robinswood Community Club v. Volpe,* 506 F.2d 1366 (9th Cir.1974). *See also Rudolph v. City Manager of Cambridge,* 341 Mass. 31, 167 N.E.2d 151 (1960) (affirming order enjoining city from paying replacement subcontractor where substitution of plaintiff subcontractor violated state public works contract bidding statute).

In short, Clark Pacific has made a convincing showing that prior to the approval by the Public Works Board of Krump's request for substitution, it did not fail or refuse to execute a subcontract offered in terms reasonably close to those contained in its bid, after having had a reasonable opportunity to do so. The likelihood that Clark Pacific will prevail on the merits of its statutory and constitutional claims therefore appears substantial.

### E. Balance of Hardships

 Having demonstrated to the satisfaction of the court a substantial probability of irreparable injury to itself and to the public, as well as a substantial likelihood of prevailing on the merits of its statutory and constitutional claims, it remains for the court to weigh in the balance the respective hardships to the parties and the public caused by granting or denying Clark Pacific's motion for a preliminary injunction. *Fort Sumter Tours, Inc. v. Andrus,* 564 F.2d 1119, 1124 (4th Cir.1977). The court must bear in mind the practical considerations of efficient execution and performance of government construction contracts, the public interest in avoiding excessive or unnecessary costs, and Clark Pacific's entitlement to fair treatment through adherence, by the awarding authority and the prime contractor, to statutes and regulations. *Princeton Combustion Research Labs., Inc. v. McCarthy,* 674 F.2d 1016, 1022 (3d Cir.1982); *Housing Auth. v. Pittman Constr. Co.,* 264 F.2d 695, 697–98 (5th Cir.1959) (Wisdom, J.). The court may not substitute its judgment for that of the

awarding authority, but may only act where the authority's decision is irrational or arbitrary. *Princeton Combustion Labs., ibid.; Pittman Constr., id.* at 703 (recognizing right of awarding authority "to be wrong, dead wrong; but not unfairly, arbitrarily wrong").

First among the harms which may result from the issuance of an injunction will be delay in constructing the buildings. Delay inconveniences the public and may result in additional costs. *Cunningham v. Adams,* 808 F.2d 815, 822 (11th Cir.1987). Against the public's and the State's interest in swift completion of the project weigh the harm to Clark Pacific, and the harm to the public interest in ensuring a lawful bidding process and fair, untainted bargaining between the State and its contractors, and between those contractors and their subcontractors. Also weighing in favor of an injunction is the hardship upon the public caused by the erection of a public facility by subcontractors who may be tempted to cut corners, and do shoddy work, in order to make up some of the profits lost through untrammeled—and illegal—bid-shopping.

The court recognizes that delay from the issuance of the injunction sought by Plaintiff Clark Pacific is, perhaps, inevitable. Krump may be subject to liquidated damages if it fails to complete this project in time. The State may not take delivery of the facility on the appointed date.

The Director of the Nevada Department of Prisons, Mr. Robert Bayer, testified that at present the inmate population of NDOP's existing facilities is presently beyond "normal emergency capacity threshold." If the new inmate housing units at Lovelock are "online" by the July 1, 1997 scheduled completion date, the NDOP inmate population will still be above design capacity, but it will drop below emergency capacity levels. Prison safety is one potential casualty of overcrowding.

According to Director Bayer, if Nevada is forced to house prisoners in the facilities of neighboring States, the price is high, in both economic and human terms. Shifting prisoners between states deprives the transferred prisoners of regular contact with their families. It deprives the entire inmate population of the reassuring routine of prison life, which in turn adds to stress levels of inmates and staff. In Director Bayer's opinion, interruption of prison routine results in additional prisoner litigation, in an increase in escape attempts, in increased anxiety in prison staff, in additional staff sick leaves, and in higher prison black market prices, which in turn may result in additional thefts, assaults, and disturbances among prisoners.

Mr. Bayer also testified to the additional monetary costs of temporarily housing Nevada prison inmates out of state. Nevada must pay between $40 and $60 per day per prisoner housed in Idaho, or Colorado, or Texas. The court, however, is not convinced that the State would avoid a significant portion of these expenses were these prisoners housed in-state. Mr. Bayer testified it costs Nevada approximately $44 per day to house prisoners in the state, not including the pro rata cost of having constructed the Nevada prisons in the first place.

The court recognizes the importance of maintaining adequate space in the prisons of a State. Much of the court's docket already consists of complaints by state prisoners regarding the conditions of their confinement. But the court is not persuaded that the quickest, cheapest prison construction work will provide any help. It is preferable that the Lovelock project be delayed if that delay will ensure quality construction work, and benefit the wronged party in the bargain.

Mr. Raecke's role is in some ways the most problematic issue in this litigation. He testified that he is Nevada's most senior public employee charged with overseeing public works construction projects. He testified that the ultimate responsibility for enforcement of the State's statutes regulating the solicitation, bidding, contracting and performance of public works projects rests with him. Mr. Raecke conceded the existence of a legal duty on his part to ensure that general contractors obey the law, and he recognized that Nev.Rev.Stat. § 338.144 was designed to prevent bid-shopping.

Mr. Raecke further acknowledged having made no independent inquiry into either the reasonableness of the opportunity afforded

Clark Pacific by Krump Construction to enter into a written subcontract, or into the degree to which the offered subcontract conformed to the terms of Clark Pacific's bid. Mr. Raecke remembered being advised by Clark Pacific that Krump appeared to be shopping Clark Pacific's bid after the award of the prime contract. He admitted that $450,000 could provide a strong disincentive for Krump to negotiate in good faith with its listed precast concrete subcontractor. Granted, Mr. Raecke's position is a difficult one. He is caught between the urgency of the project (NDOP Director Bayer testified he exhorted Mr. Raecke to ensure that the Lovelock Phase II project was completed on schedule "whatever it took") and his obligations to enforce the public works contracts statutes. He was dragged despite his great reluctance into what may have struck him as a childish quarrel between Krump Construction and Clark Pacific over minor subcontract terms, while the clock was ticking. But the court's ability to empathize with the plight of a civil servant such as Mr. Raecke notwithstanding, the ends simply cannot be permitted to justify the means. Yes, Nevada needs new prisons, in a hurry. But Nevada also declared, in enacting the subcontractor listing statute, its policy with respect to the *process* by which public works contracts are let.

Mr. Raecke testified that the requirement in Nev.Rev.Stat. § 338.144(3) that the Public Works Board approve a general contractor's request to substitute a listed subcontractor implies no obligation on the Board's part to investigate the alleged grounds for substitution asserted by the general contractor under Section (3)(b). Mr. Raecke also testified that the approval requirement served only the state's interest in obtaining qualified subcontractors. Mr. Raecke's position appears to the court inappropriate at best: If the Manager of the Public Works Board will not enforce the provisions of the anti-bid shopping statute, who will?

The court finds Public Works Board Manager Raecke's approval of the substitution to be at odds with his statutory duties to enforce the laws of the State of Nevada governing public works contracts. His several duties to the people of this State may at times appear in tension with each other, but such dilemmas come with public service; conflicts between competing public interests must be resolved by public officers with more delicacy and greater circumspection than that displayed by the Public Works Board in this matter.

The court finds that the balance of hardships tilts in Plaintiff's favor. Whatever hardship befalls Defendant Krump Construction as a result of an injunction is, in the final analysis, the product of its own unethical behavior. Likewise, the hardship visited upon the State will derive from the Public Works Board's inattention to the statutory requirements for the proper letting of public construction contracts. If the court weighs the public interest in quick construction work on Defendants' side of the scale, the public's other relevant interest, as expressed by the Legislature in enacting the anti-bid-shopping statute, in curtailing exploitative practices by general contractors on public projects, and giving the public *all* the benefits of fair competition among public works contractors (including the best design and workmanship an untainted market will buy), ought to weigh equally on Plaintiff's side.

## IV. Security

No party other than the United States may be granted a preliminary injunction without first posting security for the payment of such costs and damages as may be incurred or suffered by anyone later found to have been wrongfully enjoined. Fed.R.Civ.P. 65(c); *see Maryland Dep't of Human Resources v. United States Dep't of Agric.*, 976 F.2d 1462 (4th Cir.1992). The requirement of security serves to protect a defendant who is enjoined *pendente lite* but who later prevails on the merits of the case. *Commerce Tankers Corp. v. National Maritime Union of America*, 553 F.2d 793 (2d Cir.1977), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1978).

In its prior Order filed September 19, 1996 (Doc. # 10) granting Plaintiff Clark Pacific's Motion for Temporary Restraining Order (Doc. # 4), the court required Plaintiff to post a bond in the amount of $400,000.

The completion of the project is of critical importance to all concerned, particularly to the State of Nevada. The time for additional discovery and the filing of dispositive motions should therefore be reduced from that which is normally applicable. Every effort should be made to bring this matter to trial at the earliest reasonable date. The work done on the case by the attorneys and the parties to date will shorten the usual litigation cycle. Therefore, it may be estimated that it could take approximately 100 days to bring the case to trial. In filing their discovery plan and scheduling order, the parties should take these facts into account.

There is no easy way to determine the damages which may be suffered by Krump and by the State of Nevada if the preliminary injunction is found to be wrongfully entered. The only possible reliable measuring stick we now have is the liquidated damages of $4,000 per day provided in the prime contract. If the project is delayed 100 days, then it could be reasonably concluded that Krump and the State may suffer $400,000 in damages if found to have been wrongfully restrained.

While Krump's delay could be excused because it resulted from the injunction, there may be damages owed by Krump to the other subcontractors, and Krump may suffer other incidental expenses as a result of the delay, and the state may have to pay the cost of housing prisoners outside Nevada until the new phase of the prison can be completed. The cost to the State is problematical since it appears that the cost of maintaining the prisoners in-state and out-of-state is not that different, but nonetheless exists.

In the absence of any other reliable basis to gauge the damages which may be suffered by defendants we have no choice but to focus on the $4,000 per day liquidated damages as the best possible basis upon which to fix the bond which must be posted by plaintiff for the payment of costs and damages which may be incurred or suffered should defendants be found to have been wrongfully enjoined.

The security to be posted by plaintiff is therefore fixed in the amount of $400,000, based upon $4,000 per day for a period of 100 days.

**Conclusion**

The court determines that justice in this matter will best be served by granting a preliminary injunction restoring the principals to the *status quo* extant on bid day, June 18, 1996. *Washington Capitols Basketball Club v. Barry,* 419 F.2d 472 (9th Cir. 1969).

For the foregoing reasons, *IT IS THEREFORE ORDERED* that Plaintiff's Motion for Preliminary Injunction (Doc. # 4) is *HEREBY GRANTED.*

*IT IS FURTHER HEREBY ORDERED* that Plaintiff shall forthwith post security in the sum of $400,000.00, and that Plaintiff shall have seven days from the date of entry of this order within which time to post such security.

*IT IS FURTHER HEREBY ORDERED* that Defendant Krump Construction, Inc., its officers, agents, servants and employees are *ENJOINED* *pendente lite* from seeking to remove, removing or substituting any person, contractor, subcontractor or material supplier in the place of Plaintiff Clark Pacific to perform the work described in Clark Pacific's bid submitted to Defendant Krump Construction on June 18, 1996, including any portion of the design, manufacturing, transportation, erection, aligning, welding and grouting work on the Lovelock Correctional Center Phase II State Prison Public Works Project.

*IT IS FURTHER HEREBY ORDERED* that Defendant Krump Construction, Inc., its officers, agents, servants and employees are *ENJOINED* *pendente lite* from negotiating with, contracting with, or doing business under any contract with any person, contractor, subcontractor or material supplier in the place of Plaintiff Clark Pacific for the performance of the work described in Clark Pacific's bid submitted to Defendant Krump Construction on June 18, 1996, including any portion of the design, manufacturing, transportation, erection, aligning, welding and grouting work on the Lovelock Correctional Center Phase II State Prison Public Works Project.

**IT IS FURTHER HEREBY ORDERED** that Defendant Nevada Public Works Board Manager Eric Raecke, his agents, servants and employees are **ENJOINED** *pendente lite* from granting authority or approval to remove or substitute any person, contractor, subcontractor or material supplier in the place of Plaintiff Clark Pacific to perform the work described in Clark Pacific's bid submitted to Defendant Krump Construction on June 18, 1996, including any portion of the design, manufacturing, transportation, erection, aligning, welding and grouting work on the Lovelock Correctional Center Phase II State Prison Public Works Project.

**IT IS FURTHER HEREBY ORDERED** that Defendant Nevada Public Works Board Manager Eric Raecke, his agents, servants and employees are **ENJOINED** *pendente lite* from granting any request from Krump Construction, Inc., Buehner Corporation or Bragg Crane to approve shop drawings, material supplier submittals, designs or any other matters respecting the work described in Clark Pacific's bid submitted to Defendant Krump Construction on June 18, 1996, including any portion of the design, manufacturing, transportation, erection, aligning, welding and grouting work on the Lovelock Correctional Center Phase II State Prison Public Works Project, and which matters require prior approval by the Public Works Board or the Project Architect.

**IT IS FURTHER HEREBY ORDERED** that the foregoing terms of this Order shall remain in full force and effect until entry of judgment on the merits of this action.

**IT IS FURTHER HEREBY ORDERED** that Plaintiff shall within three (3) days of the filing of this Order make personal service of copies of this Order upon all Defendants and their counsel.